UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KATE M. STETTER,

                    Plaintiff,

          v.                                    Case No. 18-C-1100

ANDREW M. SAUL,
Commissioner of Social Security,

                    Defendant.


## DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION


This is an action for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Kate M. Stetter's application for supplemental security income under Title XVI of the Social Security Act. For the reasons given below, the decision of the Commissioner will be affirmed.

## BACKGROUND

Plaintiff has been diagnosed with bipolar disorder, depression, obsessive compulsive disorder (OCD), and attention deficit/hyperactivity disorder (ADHD) and has been treated for mental health issues since at least 2012. On December 13, 2013, Plaintiff filed an application for supplemental security income with an alleged onset date of June 1, 2013. She alleged disability due to bipolar disorder and ADHD. R. 380. After her application was denied initially and on reconsideration, Plaintiff requested a hearing before an administrative law judge (ALJ). ALJ Christopher Messina held a hearing on November 9, 2016. Both Plaintiff, who was represented by counsel, and a vocational expert testified. R. 237–78.

At the time of the hearing, Plaintiff was 29 years old. R. 241. She lived with her husband and two of her three children. R. 242. Plaintiff testified that she had a high school education and that she received special education services throughout her schooling. She testified that she had not worked since 2013. When she was employed, she worked for various cleaning companies. R. 254. She reported that she would quit her job after approximately four months of employment because she became strongly overwhelmed and had a hard time coping. R. 242. She testified that she had a difficult time being around other people and with social interaction, being on time, and understanding and following directions. R. 242–43. Plaintiff indicated that when she is in a manic phase she tends to overspend money but when she's in a depressive, isolated mood, she struggles to go to the grocery store on her own because she cannot focus or concentrate. Her husband watches their children the majority of the time. R. 243.

She testified that she has difficulty remembering things due to a traumatic brain injury she sustained in a 2007 car accident and the medications she takes. R. 257. She claimed that she is unable to work because of her mental health problems. R. 243. Plaintiff testified that she sees a psychiatrist and a therapist but reported that she struggles with her current medication and feels shaky and lightheaded. R. 245–46, 261. She testified that her husband had to take a week of FMLA leave because she was unable to cope at home after she was taken off of her medications due to their side effects. R. 247–48.

Plaintiff testified that her typical day consists of being home with her two children. If she is having a bad day, her husband, who works third shift, will take care of the children during the day and work in the evening. R. 267. She indicated that, while she struggles with depression three weeks out of the month, she can moderately take care of herself. R. 262. As to activities of daily

living, Plaintiff testified that she does not "wrap her head around cooking." She does the dishes, laundry, and cleans up the toys. R. 267. Plaintiff indicated that she struggles to interact with her children and coped by cleaning. *Id.* She testified that when she has a manic episode, which usually lasts for a week, she has a tendency to overspend and to seek attention from other men. R. 269–70. She indicated that she would not be able to work when she has either manic or depressive episodes because she would be emotionally unstable. R. 270.

In a 14-page decision dated March 1, 2017, the ALJ found Plaintiff was not disabled. R. 218–31. Following the agency's five-step sequential evaluation process, the ALJ concluded at step one that Plaintiff had not engaged in substantial gainful activity since December 13, 2013, the application date. R. 220. At step two, the ALJ found Plaintiff had the following severe impairments: bipolar disorder, mood disorder, ADHD, and post-traumatic stress disorder. *Id.* He noted that, while the record referred to other impairments, including a traumatic brain injury, hypothyroidism, and obesity, he found these conditions were non-severe. R. 220–21. At step three, the ALJ determined Plaintiff's impairments or combination of impairments did not meet or medically equal any listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 221.

After summarizing the record, the ALJ concluded Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following non-exertional limitations: "understand and carry out no more than simple instructions; occasional decisionmaking and occasional changes in a work setting; no production rate or pace work; no contact with the public; and occasional contact with coworkers and supervisors." R. 222. With these limitations, the ALJ found at step four that Plaintiff had no past relevant work. R. 229. At step five, the ALJ determined that there are jobs that exist in significant numbers in the national

economy that Plaintiff can perform, such as cleaner/housekeeper, order filler, and office helper. R. 230. Based on these findings, the ALJ concluded Plaintiff was not disabled within the meaning of the Social Security Act. R. 231. The ALJ's decision became the final decision of the Commissioner. Thereafter, Plaintiff commenced this action for judicial review.

## LEGAL STANDARD

The question before the court is not whether it agrees with the Commissioner that Plaintiff is not disabled. Judicial review of the decisions of administrative agencies is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Supreme Court recently reaffirmed that "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Beistek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

"Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*,

4

374 F.3d 470, 474 (7th Cir. 2004)).  The ALJ must provide a "logical bridge" between the evidence and conclusions.  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).  Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination.  Failure to do so, unless the error is harmless, requires reversal.  *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006).  Finally, judicial review is limited to the rationales offered by the ALJ.  *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Assessment of Plaintiff's Symptoms

Plaintiff asserts that the ALJ's assessment of her symptoms rests on an erroneous evaluation of the record.  The Social Security regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms allegedly caused by her impairments.  *See* 20 C.F.R. § 404.1529.  First, the ALJ determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged."  § 404.1529(a).  If so, the ALJ then "evaluate[s] the intensity and persistence" of a claimant's symptoms and determines how they limit the claimant's "capacity of work."  § 404.1529(c)(1).  In doing so, the ALJ considers all the available evidence, including the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of her pain or other symptoms; (3) the precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to

alleviate pain or other symptoms; (5) other treatment; and (6) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *See* § 404.1529(c)(3). A court's review of a credibility determination is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). On judicial review, the court must "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted).

In this case, the ALJ noted that Plaintiff asserted that she is unable to work due to bipolar disorder, mood swings, ADHD, anxiety, irritability, flashbacks, nightmares, auditory hallucinations, insomnia, and suicidal ideation. Plaintiff claimed that her symptoms affected her ability to understand, remember, concentrate, follow instructions, complete tasks, get along with others, and handle stress and changes in routine. R. 223. The ALJ found that, while Plaintiff's medically determinable impairments could reasonably be expected to produce some of these alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. R. 223–24.

Plaintiff asserts that the ALJ provides an incomplete and incorrect assessment of the medical evidence. In particular, Plaintiff claims that the ALJ's narrative is quite different from the longitudinal record, the ALJ selectively mentioned her reported symptoms at visits, and the ALJ failed to address her mood-related symptoms as required by SSR 16-3p. But not only did the ALJ

provide a detailed summary of the evidence in the record; he also analyzed the evidence, both medical and non-medical, and explained how it was inconsistent with her alleged symptoms.

First, the ALJ explained that Plaintiff's assertion that she has not been able to work at any time since the alleged disability onset date is not supported by objective medical evidence. The ALJ noted that Plaintiff has a long history of mental health treatment for several diagnoses, and as of the alleged disability onset date, she received medication management from Moon Ja Kim, MD. The ALJ stated that Dr. Kim's initial progress notes generally show only some anxious yet euthymic moods, as well as logical and goal-directed thought processes, good hygiene, no abnormal movements, no psychotic symptoms, and no suicidal ideation. R. 224. The ALJ noted that, in June and July 2013, Dr. Kim indicated Global Assessment of Functioning (GAF) scores ranging from 55 to 60, which generally indicates only moderate symptomatology. In addition, in August 2013, Plaintiff told Dr. Kim that, even though she experienced worsening symptoms of anxiety due to her recent pregnancy, her mood was overall stable; her current medication regimen was helping somewhat with stabilizing her mood, focus, and organization; and she had been sleeping well. *Id.* Although Plaintiff subsequently complained of increased symptoms and an unstable mood, Dr. Kim advised Plaintiff to discontinue most of her psychotropic medications due to Plaintiff's pregnancy. The ALJ acknowledged that, during her pregnancy, Plaintiff continued to complain of increased symptomatology, and Dr. Kim noted irritable, anxious, and/or depressed moods, loud speech, a blunted affect, some psychomotor agitation, and poor insight. Yet, the ALJ also noted that Dr. Kim otherwise documented normal thought content, clear speech, no psychotic symptoms, fair judgment, fair concentration and attention, and fair recent and remote memory. The ALJ noted that Plaintiff began therapy in November 2013. In January 2014, Dr. Kim prescribed Effexor at Plaintiff's

7

insistence, despite her pregnancy. At her next follow-up with Dr. Kim in February 2014, Plaintiff reported a "significant improvement" in her anxiety, mood lability, and anger. Plaintiff gave birth in March 2014. The ALJ observed that in May 2014, Plaintiff told her physician that her depression was improving on her new medications.

The ALJ recognized that Plaintiff was hospitalized for aggressive thoughts a few months later, on July 12, 2014. Plaintiff reported at that time that she did "not like taking medications" and admitted to taking her psychotropic medications only "inconsistently." *Id.* Dr. Stephanie Kohler-Neuworth subsequently diagnosed post-partum psychosis and adjusted Plaintiff's medications. The ALJ noted that Plaintiff's condition improved with these medications, and she was discharged in improved condition on July 15, 2014. *Id.* Although Plaintiff was hospitalized, this time for suicidal ideation on November 2, 2014, the ALJ noted that Plaintiff's condition again improved with changes to her medications and she was discharged on November 7, 2014. R. 225.

At a follow-up visit with Dr. Kim on November 10, 2014, Plaintiff reported some improvement in her mood lability and denied psychotic symptoms. The ALJ recognized that Plaintiff continued to experience impulsivity, however. He noted that, although Plaintiff indicated that she felt overwhelmed by her daily activities, Plaintiff was able to care for her children. Plaintiff's therapist estimated a GAF score of 54, which generally indicates only moderate symptoms. Plaintiff complained of some increased symptoms in December 2014, but said she had to decrease her Cymbalta dosage because she ran out of the larger pills. Again, despite feeling overwhelmed, the ALJ noted that Plaintiff stated she was able to care for her children. The ALJ indicated that, while subsequent treatment notes generally show some anxious and constricted moods and affect, somewhat verbose speech, and only mild psychomotor agitation, Plaintiff

otherwise exhibited euthymic moods, logical and goal-directed thought processes, normal speech, good eye contact, no abnormal movements, full orientation, and no suicidal ideation or psychotic symptoms. Her GAF scores also generally ranged from 54 to 61, indicating only mild to moderate symptoms. R. 225.

In late-December 2014, Plaintiff complained of some increased symptoms, and Dr. Kim increased her Lithium dosage. In January 2015, Dr. Kim noted that, despite Plaintiff's complaints of a depressed mood and mood lability, Plaintiff had been going to a tanning booth on a regular basis. The ALJ noted that, while Plaintiff complained of manic symptoms in February 2015, she told her therapist that she had stopped taking her antidepressant medications without tapering them and that Dr. Kim was unaware that she was going to stop the medications. Plaintiff reported in June 2015 that she sometimes lacked motivation and stayed in bed for much of the day, but said her mood was improved.

The ALJ noted that in March 2015, Plaintiff presented to Dr. Matthew Herald for a second opinion regarding her psychotropic medications. At that appointment, Plaintiff described an irritable mood, and Dr. Herald noted a somewhat constricted affect, somewhat tangential thought processes, and some difficulty answering questions. The ALJ observed that Dr. Herald otherwise reported that Plaintiff exhibited overall cooperative behavior, fair to good eye contact, adequate dress and hygiene, normal speech, no psychomotor agitation or retardation, fair insight and judgment, no suicidal ideation, no hallucinations, and intact cognition. R. 225–26. The ALJ also noted that progress notes dated after that time document Plaintiff's subjective complaints of increased symptoms related to social stressors, such as relationship issues with her boyfriend/fiancé as well as the father of one of her children, financial issues, and prior sexual abuse. R. 226. Nevertheless,

on several occasions, Dr. Herald noted that Plaintiff gave him "vague and unhelpful" answers and mental status examinations generally showed only a restricted affect and tangential and/or concrete thought processes. Dr. Herald otherwise documented euthymic moods and affect, fair eye contact, normal psychomotor activity, cooperative behavior, clear speech, and no evidence of hallucinations, delusions, paranoia, or suicidal ideation. The ALJ noted that cognitive functioning was also relatively normal, as Plaintiff exhibited fair insight and judgment, fair attention and concentration, and good recent and remote memory. In May 2015, Plaintiff complained of a lack of motivation but said her mood was improved and she was "pretty good" overall. *Id.*

The ALJ noted that on January 14, 2016, Plaintiff started a partial hospitalization program at Rogers Memorial Hospital. During the initial psychiatric evaluation, Plaintiff described a "chill" mood, and Mitzi Albright, MD, documented a full affect and congruent mood. The ALJ observed that other mental status findings were relatively normal and included calm and cooperative behavior, good eye contact, good grooming and hygiene, clear and articulate speech, normal psychomotor activity, organized and goal-directed thought processes, fair insight and judgment, and no complaints of suicidal ideation or hallucinations. Her cognitive testing was also essentially normal, and Plaintiff exhibited intact long- and short-term memory. Plaintiff left the program after completing just two days of treatment, apparently because she got strep throat. R. 225. In March 2016, although Plaintiff complained that her situation had worsened, Dr. Herald noted that she appeared "more stable than at times in the past." R. 226. Plaintiff re-enrolled in a partial hospitalization program at Rogers Memorial Hospital on October 20, 2016, which she completed on November 2, 2016.

The ALJ noted that, at the hearing on November 9, 2016, Plaintiff testified to significant auditory hallucinations, but the medical record contained no evidence of any such complaints until

10

the second partial hospitalization program. Plaintiff also made no mention of hallucinations during her visits with Dr. Herald during this time. Accordingly, the ALJ found that Plaintiff's allegations of hallucinations do not reflect the existence of any "disabling" symptoms, and the limitations in the RFC adequately account for all of her mental impairments. *Id.*

The ALJ also gave little weight to the global assessment of functioning (GAF) scores in the record that are at or below 50. He explained that GAF scores are only subjective estimates by a clinician of the claimant's status in the preceding two weeks, and many of the scores were provided upon Plaintiff's initial admission to treatment or when she was pregnant and not taking normal amounts of her medications. Instead, the ALJ found the consistency of the higher GAF scores in the record and the preponderance of the examination findings from Plaintiff's treating and examining sources support a reasonable inference that Plaintiff experiences only moderate difficulties in functioning. R. 229.

The ALJ did not ignore evidence of Plaintiff's bad days and the fluctuation of her reported symptoms as Plaintiff suggests. He acknowledged the normal signs and findings as well as the abnormal ones, and minimally articulated his consideration of this evidence. The ALJ ultimately concluded the medical evidence did not fully support Plaintiff's allegations of disabling symptoms and referenced specific facts in the record that demonstrated the path of his reasoning. In light of the deference owed the ALJ, no more is required.

Plaintiff contends that the ALJ also failed to discuss her bipolar disorder. Although the ALJ did not mention bipolar disorder by name when analyzing the medical evidence, he sufficiently considered the symptoms related to that condition. Plaintiff also asserts that the ALJ erred because he did not fully discuss the therapy notes. But, based on the ALJ's summary of the medical record,

11

including references to the therapy treatment notes, it cannot be said that the ALJ ignored this line of evidence. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). In sum, the ALJ's discussion of the medical evidence in relation to Plaintiff's alleged symptoms complied with the SSA's regulations and rulings on assessing claimant credibility.

The ALJ's analysis did not end with the finding that the medical evidence did not support the degree of the subjective symptoms alleged. He also explained that Plaintiff's activities of daily living are inconsistent with Plaintiff's complaints of disabling symptoms and limitations. Plaintiff challenges the ALJ's reliance on her activities of daily living. Although an ALJ must consider the claimant's daily activities as one of the factors in evaluating intensity and persistence of pain, "this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). An ALJ cannot place "undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362–63 (7th Cir. 2006). In this case, the ALJ did not equate Plaintiff's ability to perform certain activities with an ability to work full time. Instead, he used Plaintiff's admitted activities to assess her statements concerning the intensity, persistence, and limiting effects of her symptoms. *See Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013) ("The ALJ concluded that, taken together, the amount of daily activities Pepper performed, the level of exertion necessary to engage in those types of activities, and the numerous notations in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of pain and disability.").

Plaintiff maintains that the activities of daily living the ALJ cites are either incorrect, inconsequential, or are not inconsistent with Plaintiff's allegations. But the ALJ properly relied on her reported activities to assess the credibility of her statements concerning the intensity, persistence,

and limiting effects of her impairments. The ALJ noted that, although Plaintiff testified that she stayed in bed for most of the day, that she spends approximately three weeks in bed each month, and that her fiancé often cares for the children, she has generally been able to care for her two young children during the day, by bathing them, changing diapers, and feeding them. R. 223, 226. She is able to prepare simple meals for herself on a daily basis and is able to do household chores, such as cleaning, washing dishes, and laundry, which takes approximately one to two hours per week. R. 223. Plaintiff noted no difficulty with activities of personal care, though she sometimes lacked motivation to care for personal hygiene. Plaintiff spent time with family members a few times per week but did not spend time with others. *Id.* However, in 2015, Plaintiff had been going to a tanning booth on a regular basis and was using social media regularly. Plaintiff also shopped in stores two to three times per week, went to the mall with her boyfriend, went to the Wisconsin Dells water park with her family, went on a second vacation with her family, and went on a school field trip with her daughter. In 2016, Plaintiff went on vacation to Florida and planned to go to a pumpkin farm and trick-or-treating with her children. R. 226. The ALJ concluded Plaintiff's description of her daily activities is inconsistent with her complaints of disabling symptoms and limitations. He properly followed the regulations governing the assessment of a claimant's statements concerning her symptoms.

Plaintiff asserts that the ALJ failed to consider her medication and its side effects when evaluating her symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. § 416.929(c)(3)(iv). Contrary to Plaintiff's assertions, however, the ALJ discussed Plaintiff's medications and her reported side effects, including drowsiness, blurry vision, and agitation. R. 223. The ALJ noted that, in 2013, Plaintiff reported that her current medication regimen had been helping somewhat with

stabilizing her mood, focus, and organization and that she had been sleeping well. R. 224. Though Plaintiff stopped taking most of her medications shortly thereafter because she had recently discovered she was pregnant, Dr. Kim prescribed Effexor in January 2014 at Plaintiff's request. Plaintiff then reported a significant improvement in her mood and depression. The ALJ acknowledged that Plaintiff was hospitalized for aggressive thoughts in July 2014 because she did not like taking medications and took her psychotropic medications inconsistently. The ALJ noted that her medications were adjusted and her condition had improved. R. 224. Although Plaintiff was hospitalized again in November 2014, her condition again improved with changes to her medications. R. 225. Plaintiff subsequently reported some improvement in her mood and denied psychotic symptoms. The ALJ observed that Plaintiff decreased her Cymbalta dosage in December 2014 because she ran out of larger pills. The ALJ noted that Dr. Kim increased Plaintiff's Lithium dosage when she complained of increased symptoms, and in 2015, Plaintiff complained of manic symptoms because she stopped taking her antidepressant medications without tapering them. R. 225. In other words, the ALJ fully described Plaintiff's medication history, and noted when medications were adjusted based on side effects or ineffectiveness. In short, the ALJ did not fail to consider the side effects of Plaintiff's medication in assessing her credibility.

The ALJ also considered Plaintiff's work history in assessing her symptoms. Plaintiff contends that the ALJ's consideration of her work history was improper. An ALJ can consider information about the claimant's prior work record in assessing credibility. *See* 20 C.F.R. § 416.929(c)(3). The Seventh Circuit has recognized that "[i]nfrequent employment before the onset date can suggest, in some circumstances, a disinclination to work rather than a disability." *Richards v. Berryhill*, 743 F. App'x 26, 30 (7th Cir. 2018) (citing *Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir.

2009)). In this case, the ALJ noted that he could not infer that Plaintiff stopped working on the alleged onset date solely due to her impairments. He observed that Plaintiff's earnings record reveals a history of sporadic and relatively low earnings. In particular, Plaintiff's yearly wages have ranged from $317 to $4,326, and no wages were reported in several of the years prior to the alleged disability onset date. Plaintiff indicated in an initial disability report that she stopped working for a few years prior to the alleged disability onset date, in June 2011, because she went to school and moved. Since that time, Plaintiff indicated that she remained unemployed for similar reasons, not because of any alleged disability. For instance, in July 2014, Plaintiff described herself as a homemaker and a "full time mother," and explained that her education had been interrupted when she became pregnant with her first child. For these reasons as well, the ALJ found that Plaintiff's complaints of disabling symptoms are not fully supported by the record. R. 227. Plaintiff asserts that, because she has difficulty performing her role as a mother, the ALJ erred in inferring that Plaintiff is forgoing work to stay home with her children. But the ALJ considered Plaintiff's reports that she felt overwhelmed with her children in light of the record as a whole and found that, despite feeling overwhelmed, Plaintiff had generally reported that she was able to care for her children. R. 222 (citing R. 762 ("Patient reported that she has taken over full responsibility for her 7 year old daughter [due to] her father's recent behaviors. Patient reported that she is a full-time mother and is wanting to learn effective parenting skills.")); R. 225 (citing R. 720, 728). In short, the ALJ did not err in considering Plaintiff's sparse work record in assessing her credibility.

Distinguishing between what a person cannot do and what a person will not do is often difficult, even for the person herself. The ALJ recognized that Plaintiff has impairments that impact her ability to work, but not to the degree alleged. He followed the regulations governing the

assessment of Plaintiff's symptoms and provided adequate support and explanations for his findings. His conclusion is not patently wrong and thus does not necessitate remand.

## B. Assessment of Medical Opinions

Plaintiff claims that the ALJ erred in his assessment of the opinions of her treating psychiatrist, Dr. Herald. In August 2016, Dr. Herald indicated that Plaintiff has struggled with job stability and appeared unable to work full or part time. R. 841. Dr. Herald also completed a medical source statement regarding Plaintiff's ability to do work-related activities on October 28, 2016. R. 1265–67. He checked boxes indicating that Plaintiff has no limitations in her ability to understand and remember short, simple instructions; mild limitations in her ability to carry out short, simple instructions; and marked limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, and make judgments on simple work-related decisions. He noted that Plaintiff had a history of traumatic brain injury as well as mood swings affecting her ability to respond appropriately to work expectations. R. 1265. Dr. Herald also checked boxes indicating that Plaintiff has moderate limitations in her ability to interact appropriately with the public, to interact appropriately with supervisors, and to interact appropriately with co-workers as well as marked limitations in her ability to respond appropriately to work pressures in a usual work setting and to changes in a routine setting. He noted Plaintiff has a history of difficulty working with others, limited engagement in improving areas where she has difficulty, and sensitivity to criticism. He also noted that she has a limited ability and engagement with math. Rather than cite to treatment notes, he noted that Plaintiff's self-reports supported his assessment. R. 1266. Dr. Herald found that Plaintiff cannot manage benefits in her own best interest and indicated that Plaintiff did not trust her

own ability to manage funds. Instead, she requested that her boyfriend manage her finances. R. 1967. The ALJ gave little weight to Dr. Herald's opinions. R. 228.

Under the regulations in effect at the time of the ALJ's decision, the ALJ must give a treating source's medical opinion on the nature and severity of the claimant's impairments "controlling weight" if the opinion is "well-supported by the medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(c)(2). If an ALJ gives the treating source's medical opinion less than controlling weight, he must articulate "good reasons" for doing so. *Id.* In such a case, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ is not required to "explicitly weigh every factor." *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 414–16 (7th Cir. 2008). Instead, the ALJ need only "sufficiently account for the factors." *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013).

The ALJ sufficiently accounted for the regulatory factors and articulated "good reasons" for finding that Dr. Herald's opinion was not entitled to controlling or deferential weight. R. 228. He explained that, although Dr. Herald has been Plaintiff's treating psychiatrist since March 2015, his assessment was unsupported by objective signs and findings in the preponderance of the record and was inconsistent with other substantial evidence in the record, including his own treatment notes. The ALJ observed that Dr. Herald noted that he based the limitations on carrying out instructions in part on Plaintiff's history of a traumatic brain injury, but the ALJ found that that injury was not a medically determinable impairment. He also noted that Dr. Herald's progress notes generally

document only a constricted affect, somewhat tangential and/or concrete thought processes, and some difficulty answering questions but otherwise documented euthymic moods and affect on several occasions, overall cooperative behavior, fair to good eye contact, adequate dress and hygiene, normal speech, no psychomotor agitation or retardation, fair insight and judgment, no suicidal ideation, no hallucinations, and intact cognition. The ALJ concluded the limitations in the RFC adequately account for the objective findings in Dr. Herald's progress notes. R. 229.

The ALJ also discounted Dr. Herald's opinion because Dr. Herald indicated that the limitations in his assessment were based directly on Plaintiff's self-report and many of the progress notes document Plaintiff's subjective complaints of situational stressors. R. 228–29. Plaintiff argues that, under the law of this circuit, an ALJ errs when he excludes a mental health provider's opinion because it is based on the claimant's own report of her symptoms. As the Seventh Circuit explained in *Mischler v. Berryhill*,

> The Commissioner argues that Dr. Dennison's opinion was not supported by medical evidence because she simply "noted and recorded" Mischler's complaints. As the Commissioner puts it, "the act of transcription does not transform her subjective allegations into medical evidence." We do not find this observation helpful. A psychiatrist does not merely transcribe a patient's subjective statements. Mental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lens of her professional expertise. *See Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015). Further, the trained physician, not the ALJ, is better positioned to discern "true" complaints from exaggerated ones. *See id.*

766 F. App'x 369, 375 (7th Cir. 2019) (internal citations omitted); *see also Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015) ("But psychiatric assessments normally are based primarily on what the patient tells the psychiatrist, so that if the judge were correct, most psychiatric evidence would be totally excluded from social security disability proceedings—a position we rejected . . . ." (citation omitted)).

These cases are distinguishable from the instant case, however. In this case, Dr. Herald explicitly noted that his assessment was solely supported by Plaintiff's self reports. Dr. Herald did not provide a citation to any treatment notes that supported his extreme limitations, and there is no indication that Dr. Herald actually assessed these complaints "through the objective lens of [his] professional expertise." *Mischler*, 766 F. App'x at 375 (citation omitted). As a result, the ALJ's decision to assign little weight to the limitations found in Dr. Herald's questionnaire was logical and adequately supported by the record evidence. *See Jacoby v. Barnhart*, 9 F. App'x 939, 942 (7th Cir. 2004) (ALJ properly declined to afford controlling weight to treating physician opinion because it "lacked substantiation in his earlier treatment notes"); *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (noting that it is permissible for the ALJ to discount a medical opinion that is based on subjective complaints); *Alvarado v. Colvin*, 836 F.3d 744, 748 (7th Cir. 2016). The ALJ gave logical reasons for the weight he afforded Dr. Herald's opinions.

## C. RFC

Plaintiff also challenges the ALJ's assessment of her symptoms as they relate to her RFC. A claimant's RFC specifies the most that a claimant can do despite the physical or mental limitations imposed by her impairments. SSR 96-8p, 1996 WL 374184, at *2. In forming an RFC, the ALJ must review all of the relevant evidence in the record, including any information about the claimant's symptoms and any opinions from medical sources about what she can still do despite her impairments. *Id.* The ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess the RFC." *Id.* at *5. In this case, the ALJ found that Plaintiff has the RFC to perform a "full range of work at all exertional levels but with the following nonexertional limitations: understand

and carry out no more than simple instructions; occasional decisionmaking and occasional changes in a work setting; no production rate or pace work; no contact with the public; and occasional contact with coworkers and supervisors." R. 222.

Plaintiff asserts that the ALJ improperly relied on the state agency reviewing physicians' opinions in forming the RFC. After giving Dr. Herald's opinion little weight, however, it was entirely reasonable for the ALJ to rely on the opinions of the state agency consultants, the only other sources that offered opinions related to Plaintiff's functional capacity. After all, state agency "medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i). State agency reviewing psychologist, Susan Donahoo, Psy.D., completed a mental residual functional capacity assessment in May 2014. She noted that Plaintiff has been treated for bipolar disorder and ADHD and that her stress appears to be largely related to parenting difficulties and relationship issues with her family members. She summarized Plaintiff's treatment as follows:

> [Plaintiff] reported worsening symptoms after August 2013, when she became pregnant with her 3rd child. She stopped taking some of her medications and [started] attending therapy. With medication adjustment in January 2014, "a significant improvement" was noted. She continued to experience mild hypomanic symptoms occasionally as well as some ADHD symptoms. According to the report from her most recent follow up on 5/1/14 (6 weeks postpartum), she was feeling overwhelmed and anxious from taking care of her newborn baby and another 2-year-old child as a single mother. Mental status exam was largely unremarkable. Her day-to-day functioning remains adequate.

R. 287. Dr. Donahoo found that Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent

pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to supervisors, get along with coworkers or peers, and respond appropriately to changes in the work setting. R. 286–87. She concluded, overall, that there was no evidence indicative of debilitating impairment and that Plaintiff is mentally capable of sustaining unskilled work. R. 287.

John Warren, Ed.D., reviewed the updated record in December 2014. As to Plaintiff's sustained concentration and persistence limitations, Dr. Warren found that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. He also found Plaintiff was markedly limited in her ability to carry out detailed instructions. R. 297–98. Dr. Warren explained that Plaintiff is able to sustain the mental demands associated with carrying out simple tasks over the course of a routine workday/workweek within acceptable attention, persistence, and pace tolerances but would be unable to do so for moderately to highly complex/detailed tasks requiring sustained concentration. R. 298.

As to Plaintiff's limitations in social interaction, Dr. Warren found that Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. He found that she was markedly limited in her ability to interact appropriately with the general public. Dr. Warren explained that Plaintiff is able to sustain the basic demands

associated with relating adequately with supervisors and co-workers but is unable to interact appropriately with the general public. *Id.* Finally, as to Plaintiff's adaptation limitations, Dr. Warren found that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. He elaborated that Plaintiff is able to adapt to routine workplace change, remain aware of environmental hazards, form basic plans/goals, and travel independently. *Id.*

The ALJ gave some weight to the opinions of the state agency physicians, but gave greater weight to Dr. Warren's opinion. The ALJ explained that Dr. Donahoo indicated moderate limitations in several areas but limited Plaintiff to only unskilled work, which does not fully account for the areas of moderate limitation she identified. R. 227. He gave greater weight to Dr. Warren's opinion because he provided some additional limitations to account for his assessment. The ALJ noted that the limitation in the RFC for understanding and carrying out no more than simple instructions accounts for Dr. Warren's finding of marked impairment in Plaintiff's ability to carry out detailed instructions and that she could not perform highly complex or detailed tasks. R. 227–28. The ALJ also limited Plaintiff to occasional decisionmaking, occasional changes, and no production rate or pace work to account for the state agency findings of moderate impairment in Plaintiff's ability to sustain concentration, complete a normal workday and workweek, and respond appropriately to workplace changes. R. 228. He explained that the limitation for occasional contact with supervisors and coworkers accounts for the finding of moderate impairment in this area. He also precluded Plaintiff from all work contact to account for Dr. Warren's opinion that Plaintiff is markedly impaired in the ability to interact appropriately with the general public, despite Plaintiff's statements in the record that she went to a water park, went on vacation, and attended group therapy

sessions. The ALJ explained that these limitations account for findings in the mental health progress notes which generally show no more than moderate symptomatology. *Id.* In short, it was appropriate for the ALJ to rely on the opinions of the state agency reviewing psychologists.

But the ALJ did not rely entirely on the state agency reviewing physicians' opinions in forming the RFC. Again, the ALJ conducted an extensive review of the medical evidence and limited Plaintiff as set forth in the RFC to account for findings in Plaintiff's mental health progress notes and other evidence in the medical record. Plaintiff argues that the ALJ omitted entire lines of evidence and failed to reconcile inconsistencies in the record. As explained above, the ALJ did not selectively analyze the record relating to Plaintiff's impairments. Without any allegations from Plaintiff that her conditions created any limitations and restrictions beyond those included in the RFC, the ALJ was not required to create limitations of his own. In short, the ALJ properly evaluated the medical evidence, including the state agency physicians' opinions, in creating the RFC. For these reasons, substantial evidence supports the ALJ's RFC finding.

## CONCLUSION

For the reasons set forth above, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this _23rd_ day of September, 2019.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

23